Randolph & Jenks *v.* Merchant's Bank.

RANDOLPH & JENKS *v.* MERCHANT'S NATIONAL BANK
OF MEMPHIS *et al.*

1. SUPREME COURT. *Can only adjudicate upon matters raised by the pleadings.*
The courts can only adjudicate such matters as are properly brought
before them by the parties in the mode prescribed by law and the
practice of the court; they cannot notice matter, however clearly
proved, of which there is no allegation or issue in the pleadings; and
the Supreme Court has no more power than the lower courts to pro-
nounce a decree upon matter outside of the record.

2. COLLATERAL SECURITY. *Pledgee or assignee. His rights and powers.*
A pledgee or assignee of collateral security, with authority to settle
with the parties liable on such securities, may, in good faith, com-
pound the debt, and will only be liable for the actual amount due to
the assignor from such parties; and, although ordinarily a change
of security would not be allowable which was not plainly advanta-
geous, yet the assignee, who has an interest in the fund, and acts in
good faith under the advice of counsel, would not be liable under the
circumstances except for an abuse of trust.

3. SUPREME COURT PRACTICE. *A cause will not be remanded. When.* A
cause will not be remanded for the purpose of bringing new parties
before the court after a protracted litigation, unless the applicant's
right to relief be clear.

FROM SHELBY.

Appeal from the Chancery Court at Memphis.   W.
W. McDOWELL, Ch.

R. J. MORGAN and GREER & ADAMS for complainants.

W. D. BEARD for defendants.

COOPER, J., delivered the opinion of the court.

The original bill in this case was filed, on the 29th

of November, 1867, by the complainants, citizens and merchants of Philadelphia, Penn., against the Merchant's Bank of Memphis, and two of its officers, the latter being made defendants for the purpose of obtaining the discovery asked for under oath. The case made by the bill was that the complainants, by arrangement with O. C. Boone & Co., a commission firm at Memphis, had been in the habit of accepting the bills of exchange of the latter firm, based upon shipments of cotton, drawn upon them with bills of lading of the cotton attached, and negotiated through the defendant bank; that in June, 1867, Boone & Co. drew upon them two drafts, one for $8,100, and the other for $1,800, both apparently secured by shipments of cotton, and bills of lading attached, which drafts were forwarded by the defendant bank, accepted and paid by complainants; that the supposed bills of lading turned out to be fictitious, and Boone & Co. had become insolvent. And the complainants sought to recover the money advanced by them, from the Merchant's Bank upon the ground that the bank had guaranteed the payment of the drafts, or were interested with Boone & Co. in the transactions, or had colluded with that firm in the fraud. Such proceedings were had in the cause that upon final hearing the chancellor gave the complainants a decree against the bank for $1,152, being the value of the cotton which the bank had guaranteed should be forwarded as a margin upon the larger bill of exchange, with interest, the other issues being found in favor of the defendant.

In the progress of the case, the deposition of O.

Randolph & Jenks *v.* Merchant's Bank.

C. Boone, the leading partner of Boone & Co., was taken. He testified that he had transferred to the Merchant's Bank certain assets of Boone & Co., to secure the bank from loss on the paper of the firm which it held. He further stated that, after the filing of complainant's bill, when sent for by W. H. Cherry, the president of the bank, he had agreed that the bank might hold the collaterals to indemnify it against any recovery in the suit, remarking at the time that they were probably sufficient to pay the bank, and also the debt due to complainants. He was then asked whether he did then or subsequently transfer to the bank or its president any securities to pay complainants' debt. His answer was: "Never specially for that purpose. It was to pay Randolph & Jenks and the Merchant's National Bank. I don't say that I told Mr. Cherry that, but that was my intention." He added: "I considered the whole thing as the Merchant's National Bank's, and they responsible for it. I mean that the bank would have to pay Randolph & Jenks ultimately."

No mention had been made in the bill or answer of any collaterals held by the bank, nor any suggestion that the bank might be indebted to Boone & Co., nor any prayer for an account, nor were Boone & Co. parties to the suit. Nevertheless, the decree of the chancellor contained the following provisions: "It further appearing to the court that O. C. Boone or O. C. Boone & Co., for the purpose of securing their indebtedness to the Merchant's National Bank, and as an indemnity and security for the payment of the

claims of complainants, turned over to said bank various and divers assets, consisting of claims, choses in action, etc. And it appearing to the court that complainants are entitled to have an account from said Merchant's National Bank, to the end that any and all such assets and effects may be applied under and according to the trusts on which they were placed in possession of the bank, and of its duly authorized officers. It is therefore accordingly ordered and decreed by the court that a reference be, and the same is hereby directed to the clerk and master of this court, who will take and state an account with said bank in respect to the securities placed in its possession by said O. C. Boone & Co. or O. C. Boone, and report fully as to the rights of the parties in respect to said matters."

From this decree, the complainants took an appeal to this court, where the cause was heard and determined at the April term, 1874. The opinion then delivered is reported in 7 Baxt., 458. From this opinion it appears that the only question considered by the court was the extent of the bank's liability to the complainants under the allegations of the bill. The decree at first drawn up and entered was limited accordingly. A few days afterwards, another entry was made on the minutes, remanding the cause to the chancery court "for the taking of the account as to the assets of O. C. Boone & Co. in the hands of the Merchant's National Bank, and for any proper decree in reference thereto."

On July 17, 1877, after the cause was remanded,

the complainants filed an amended and supplemental bill, the sole object of which was to bring the Metropolitan Bank of New York before the court, as the assignee or principal holder of the assets of the Merchant's Bank, and, upon an allegation that the Metropolitan Bank was about to remove said assets, to impound them to the extent of the collaterals mentioned. Such proceedings were had in the cause that the master took the account ordered and made a report. Exceptions were filed by both parties, which were acted upon by the chancellor, and a decree rendered in favor of the complainants against the Merchant's Bank for $16,987.73. The Merchant's Bank has brought the case to this court by writ of error.

The object of the original bill was to hold the bank liable to the complainants for the money paid by them on the faith of the fictitious bills of lading. The prayer of the bill was that the defendant bank, or the other defendants its officers, be decreed to be liable to the complainants for the amount of the drafts mentioned, and that the same be collected by execution; and, at all events, that said bank be declared to be bound to them upon the guaranty of said draft, or a portion of the same. O. C. Boone & Co. were not made defendants, nor of course was any relief sought against them. Neither in the bill, nor in the answer was any statement or allusion made as to any collaterals placed in the hands of the bank or its officers for any purpose. The existence of such collaterals was developed in the proof. The decree of the chancellor in reference to these collaterals, and the

·subsequent order of this court, if intended to be in affirmance of that decree, were not justified by anything in the pleadings. It also appears in the proof taken upon the reference, after the remand, that the members of the firm of O. C. Boone & Co. went into bankruptcy, and the assets in controversy seem to have been sold by the assignee, and the purchaser has brought suit against the Merchant's Bank therefor. Under these circumstances, the first point made by the appellant is that the whole proceedings were *coram non judice*, and void.

It is an elementary principle that the courts can only act upon such matters as are properly brought before them by the parties, according to the settled law, practice and usage: *Windsor* v. *McVeigh*, 93 U. S., 282. The court cannot rightfully notice matter, however clearly proved, of which there is no allegation or issue in the pleadings: *Sheratz* v. *Nicodemus*, 7 Yer., 13; *Bedford* v. *Williams*, 5 Cold., 207; *Furman* v. *North*, 4 Baxt., 296; *Austin* v. *Ramsey*, 3 Tenn. Ch., 118. No relief can properly be granted in chancery upon any matter which does not appear either in the bill or the answer: *Rogers* v. *Breen*, 9 Heis., 679. And this court [has repeatedly held that it has no more power than an inferior court to pronounce a decree binding on the parties upon matters which are not brought before it in the regular mode for adjudication, but are entirely outside of the cause: *Easley* v. *Tarkington*, 5 Baxt., 592; *Meredith* v. *Little*, 6 Lea, 517; *Hill* v. *Hillsman*, 7 Lea, 197; *Pettit* v. *Cooper*, opinion in MS. at this term. It is obvious, therefore, that

the original decree of reference to the chancellor, and the order of this court so far as it was in affirmance thereof, were without authority, and void.

It may be, however, in view of the tacit acquies-cence of the parties in what was done, that the cause should be remanded, if desired by the complainants, in order to amend the pleadings, and bring the proper parties before the court.  To this end, the merits of the case have been looked into.  The balance found against the Merchant's Bank by the chancellor's decree consists entirely in two items of charge, both of which was brought before us by the writ of error.  It is absolutely certain that not a dollar was ever received by the bank upon the largest of these items, and the weight of testimony is that only a small part of the other was collected.  The chancellor was, however, of opinion that the bank must be held liable for the nominal amount of both, because it was a pledgee without authority to settle.  In this, he was clearly in error.

The lawyer who drew up the assignment from Boone & Co. to the bank of many of the claims trans-ferred as collateral or pledged, including the Dale claim one of those in dispute, testifies that: "All of said accounts then so assigned was made out in full against the said parties as from the books of O. C. Boone & Co., but the true amount of neither was then fixed by a final settlement with the parties thereto."  Boone says: "Of course there was a settlement to be made by Cherry with Dale."  And both the attorney and Boone say that this claim was settled with the party

by the bank, and Boone's testimony, not only shows knowledge on his part of the settlement, but fairly implies that it was in pursuance of authority conferred at the time of the assignment. And the whole evidence of this witness leaves no room for doubt that the bank, or W. H. Cherry its president, had full authority to do the best that could be done with all the claims for the purpose of indemnifying the bank, and Cherry individually, against loss on the debt of Boone and Boone & Co. to them. The bank was really a trustee, and not merely a pledgee, if, indeed, there be any difference in the liability incurred by the course pursued in realizing the assets.

A trustee, acting in good faith, may release or compound a debt due to his trust estate: *Blue* v. *Marshall*, 3 P. W., 381; *Firshaw* v. *Higginson*, 8 D. M. & G., 827. But if he releases or compromises a debt without sufficient reason or justification, or if he sell a debt for a grossly inadequate consideration, when by proper diligence more could have been realized, he will be answerable for it in his accounts: *Jevon* v. *Bush*, 1 Vern., 342; *Wiles* v. *Grebham*, 5 D. M. & G., 770; Perry on Trust, sec. 482. A trustee must follow the collection of claims actively by legal proceedings, unless he can show that such proceedings would have been futile and void: Perry on Trusts, sec. 440. A pledgee, like a trustee, is bound to the pledgor for the full amount of the asset pledged, if it can be realized by law, and if the pledgor is entitled, as between him and the debtor, to the full amount of the asset. But if the pledgor himself only holds the asset to

secure a given indebtedness, his pledgee can claim no more against the common debtor, and will be liable to that extent to the pledgor: *Cherry* v. *Frost*, 7 Lea, 1.

The note of Dale, transferred to the bank or Cherry as collateral, was for $3,150. But as we have seen, the claim of Boone & Co. against Dale was subject to a settlement. Boone admits that as early as January, 1868, he was advised that a settlement had been made between Dale and Cherry. And the attorney, who drew the transfer for Boone, states that he learned from Dale the same fact, and that Dale had the note. Neither of these witnesses state the result of the settlement. On the other hand, Cherry testifies that, upon the settlement, it was found that only $632 was due from Dale, and this sum was paid to him. There cannot be a reasonable doubt of the correctness of the testimony of Cherry.

The other, and much the largest claim in dispute, consisted of the note of one Burgett for $6,768. The note was payable to Mrs. Grider, and by her and her husband endorsed. The proof of Cherry and Grider, the husband, is that the note was deposited by the husband with Boone & Co. as collateral to secure a debt of $1,600. Cherry says he learned the fact from Grider, shortly after he received the note, and called Boone's attention to it, who admitted it, except he thought the claim of the company was for about $2,000. Cherry sent the claim for collection to a lawyer in Arkansas, where the maker and the Griders lived, and went himself to consult with the lawyer in regard to ts value. He was informed, and the proof sustains

the information, that the maker and endorsers were worthless. Under the advice of counsel, upon the idea that he might be able to collect the smaller sum, Cherry surrendered the note to Grider, for the note of himself and wife for $1,600, which has never been paid. It turns out that Burgett had bought Mrs. Grider's interest in land, and had given a note for the purchase money which was secured by a lien on the land reserved in the face of the deed. The note in dispute was, however, not the note mentioned in the deed, but another note given some months afterwards for a different amount, but including the consideration for the land. Mrs. Grider was the sister of Burgett, and the land was sold by her to him, and the first note executed to her in her maiden name. These facts were not known to Cherry, nor to his lawyer, nor it would seem to Boone. After the note in controversy was surrendered to Grider, it was paid by another brother of his wife, who took the land. Under these circumstances, it is clear that the bank would, at most, only be liable for the actual indebtedness for which Boone & Co. held the note, which the weight of testimony shows was $1,600. The bank and Cherry had every inducement to secure the amount due upon the claim, and, although a change of securities would ordinarily not be allowable which was not plainly advantageous, we cannot say that there was an abuse of trust in surrendering the note, under the advice of counsel, and taking another note which the counsel thought might be collected. It seems, that Grider had an equity of redemption in certain other

realty, or rather an interest in the realty subject to a prior debt, and the expectation of counsel was to reach that interest, and perhaps the amount of the debt was important in obtaining a speedy judgment. That property was absorbed by the debt, and nothing realized. Boone testifies that in addition to the claim of Boone & Co. against Grider, which he puts at a higher figure than Cherry, for which Boone & Co. held the Burgett note, the firm of Dobbins, Pleasants & Co., of New Orleans, had a large amount against Grider and wife, for which the note could have been held. This firm, the proof shows, failed before Boone & Co., and it is clear that the complainants Randolph & Jenks, as creditors of Boone & Co., could have no claim upon this asset by reason of any accounts of Dobbins, Pleasants & Co. Besides, no such account is shown, and the testimony of Boone & Co. is not sufficiently definite, nor does he come before the court in such an attitude as to justify the court in giving much weight to his evidence. In the conflict of testimony between him and Cherry, the latter is entitled to the most credit.

If the Burgett item be disallowed, and the Dale claim reduced to $632, there is no balance due from the bank. The balance would be the other way. And to justify a remand, the right to relief upon an amendment of the pleadings ought to be clear.

Reverse the decree, and dismiss the bill as to the matters of account, with costs.